# EXHIBIT 1

DEC-14-2004 14:17 ROSS UNIVERSITY 732 978 5315 P.04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT NEW JERSEY
50 WALNUT ST RM 4015
NEWARK NJ 07102-3595

John D. Horton
PO BOX 7
JOBSTOWN NJ 08041-0007
Plaintiff,

v.

Ross University School of Medicine
499 THORNALL ST FL 10
EDISON NJ 08837-2235

Jorge Rios
499 THORNALL ST FL 10
EDISON NJ 08837-2235

Michelle Fried
499 THORNALL ST FL 10
EDISON NJ 08837-2235
Defendants.

Civil Action No. 04-5658 (JAG)

EEOC Charge No. 170-2003-02552

EXHIBIT
9
10-13-05
PENGAD 800-631-6989

## COMPLAINT

### A. PRELIMINARY STATEMENT

This case is brought pursuant to an EEOC "right to sue" letter, a copy of which is attached hereto, marked Exhibit A and incorporated herein by reference.

### B. JURISDICTION

This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e(5). Equitable and other relief are also sought under 42 U.S.C. §§ 1331, 1343 and 42 U.S.C §§ 1981 et seq. Jurisdiction of

Complaint
Horton v. Ross University, # 04-5658 (JAG)
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
50 WALNUT ST RM 4015
NEWARK NJ 07102-3595

- 1 -

John D. Horton
PO BOX 7
JOBSTOWN NJ 08041-0007

DEC-13-2004 14:15 732 978 5315 95% P.06

DEC-14-2004 14:17 ROSS UNIVERSITY 732 978 5315 P.5

employment discrimination based on age is conferred by 29 U.S.C. §§ 626(c)(1) and 626(e) and appropriate relief is also sought. The plaintiff invokes the pendant jurisdiction of this court to try cases arising under New Jersey state law.

## C. PARTIES

1. Name of the plaintiff: John D. Horton
   Present mailing address: PO BOX 7, JOBSTOWN NJ 08041-0007

2. Name of the defendant: Ross University School of Medicine
   Present mailing address: 499 THORNALL ST FL 10, EDISON NJ 08837-2235

3. Name of the defendant: Jorge Rios
   Present mailing address: 499 THORNALL ST FL 10, EDISON NJ 08837-2235

4. Name of the defendant: Michelle Fried
   Present mailing address: 499 THORNALL ST FL 10, EDISON NJ 08837-2235

## D. NATURE OF THE CASE

The plaintiff, John D. Horton, is an Hispanic minority male over the age of 40 years of age.

1. In January of 2003 the plaintiff participated in a telephone interview with Dr. Jorge Rios, Dean of Academic Affairs for the defendant, for the position of Library Director at the defendant's campus located on the Caribbean island country of Dominica. The position paid $70,000 per year.

2. At the conclusion of the telephone interview, Dr. Rios offered the plaintiff an in-person, all expenses paid trip to the Dominica campus to complete the interview process and the plaintiff accepted the offer and in consideration thereof

Complaint
Horton v. Ross University, # 04-5658 (JAG)
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
50 WALNUT ST RM 4015
NEWARK NJ 07102-3596

- 2 -

John D. Horton
PO BOX 7
JOBSTOWN NJ 08041-0007

DEC-13-2004 14:16 732 978 5315 95% P.05

are charged with fraudulent concealment for failing to properly, adequately and timely disclose their decision to breach the contract.

10. Fourth cause of action. Paragraphs 1 through 9 are incorporated herein by reference. Under the common law, statutes and Uniform Commercial Code of New Jersey the defendants (Ross University School of Medicine, Rios and Fried) are charged with fraudulent inducement by providing the plaintiff with an interview date which caused the plaintiff to decline his offer of an interview for a library director position at a Seattle area community college.

11. Fifth cause of action. Paragraphs 1 through 10 are incorporated herein by reference. Under the common law, statutes and Uniform Commercial Code of New Jersey the defendant (Fried) is charged with the tortuous interference with a contractual and business relationship for her telling Rios to breach the contract because she did not like the plaintiff because he was an Hispanic minority male over the age of 40 years and she wanted a white female hired for the position.

## F. INJURY

12. The plaintiff was denied the opportunity to interview for the position with Ross at their Dominica campus. The plaintiff would have been hired for the position but for the wrongful actions of Fried. The plaintiff declined the opportunity to interview for a library director position with a Seattle WA area community college in detrimental reliance on the interview contract which the defendant breached and would have been hired for that position. The plaintiff was gravely humiliated in not being treated like other applicants for employment.

Complaint
Horton v. Ross University, # 04-5658 (JAG)
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
50 WALNUT ST RM 4016
NEWARK NJ 07102-3595

- 5 -

John D. Horton
PO BOX 7
JOBSTOWN NJ 08041-0007

DEC-13-2004 14:16 732 978 5315 95% P.08

DEC 14 2004 14:17 ROSS UNIVERSITY 732 978 5315 P.9

The plaintiff's civil rights under Title VII and the Age Discrimination Act were violated by the defendants.

## G. REQUEST FOR RELIEF

13. The plaintiff requests any and all just and equitable relief that this court can provide.

## H. REQUEST FOR A JURY

14. The plaintiff requests a jury trial on all issues triable by a jury.

## DECLARATION UNDER PENALTY OF PERJURY

15. The undersigned declares under penalty of perjury that he is the plaintiff in the above action, and that he has read the above complaint and that the information contained therein is true and correct.

DATED: November 9, 2002

John D. Horton

Complaint
Horton v. Ross University, # 04-5658 (JAG)
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
50 WALNUT ST RM 4015
NEWARK NJ 07102-3595

- 6 -

John D. Horton
PO BOX 7
JOBSTOWN NJ 08041-0007

DEC-13-2004 14:17 732 978 5315 95% P.09

# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIVIL ACTION NO: 04-5658 (JAG)

| | | |
|---|---|---|
| JOHN HORTON, | : | |
| Plaintiff, | : | CIVIL ACTION<br>Deposition of: |
| vs. | : | JOHN HORTON |
| ROSS UNIVERSITY SCHOOL OF MEDICINE; JORGE RIOS; and MICHELLE FRIED, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - -

T R A N S C R I P T of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TERESA CUELLAR, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, held at the offices of LINDABURY, McCORMICK & ESTABROOK, PA, 53 Cardinal Drive, Westfield, New Jersey, on Friday, May 13, 2005, commencing at 11:05 p.m., pursuant to notice.

SENTRY COURT REPORTING
&
LITIGATION SERVICES, LLC
45 Horse Hill Road
Cedar Knolls, New Jersey 07927
Phone: 1-973-359-8444 Fax: 1-973-359-1049

A P P E A R A N C E S:

LINDABURY, McCORMICK & ESTABROOK, PA
53 CARDINAL DRIVE
WESTFIELD, NEW JERSEY 07091
(908) 233-6800
BY: JOHN SCHMIDT, ESQ.
ATTORNEYS FOR THE DEFENDANTS

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN HORTON | | | | |
| By: Mr. Schmidt: | 4 | | | |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Resume | 77 |
| 2 | On-line job | 20 |
| 3 | E-mails | 25 |
| 4 | E-mails | 29 |
| 5 | E-mails | 31 |
| 6 | Interrogatories | 33 |
| 7 | Resume | 37 |
| 8 | Resume | 40 |
| 9 | Complaint | 52 |

J O H N H O R T O N, is duly sworn by a Notary Public of the State of New Jersey and testifies under oath as follows:

DIRECT EXAMINATION BY MR. SCHMIDT:

Q. Mr. Hortan, I introduced myself. My name is John Schmidt. I am the attorney representing the defendants in this litigation. We have asked you here today for the purpose of taking your deposition. What that is very simply, it's going to be a series of questions I'm going to ask you and that I would like you to respond to the best of your ability.

If you do not understand a question that I ask, please tell me, and I'll try to rephrase it so you do understand it. If you answer a question that I ask, we're going to assume that you did understand it and that you answered it to the best of your ability.

If at any time you need to take a break during the course of this deposition, it's an informal proceeding, you're in my office, just tell me. As long as a question isn't pending for which there's no answer we can take a break. You can use the men's room, coffee, whatever you need.

If at any time during the deposition you feel that you need to read something, please take your time. Don't rush. This isn't a fire drill. I want to make sure that your answers are complete and as accurate as best as possible.

Do you understand my instructions so far?

A. Yes, I do.

Q. Okay. Everything that's being said here today is being transcribed by the court reporter to my left and your right. It's therefore necessary for you to give oral answers to all your questions. She cannot take down a nod of the head or gesture of the hand.

It's also important that we try not to interrupt each other as humans have a tendency to do in conversation because it makes it very difficult for her to transcribe two people talking at the same time. So even though you may anticipate an answer to my question, please wait until I finish the question so that she can take it down completely and then I will also try not to interrupt your answers.

Are you taking any medications that you believe in any way would inhibit your ability to listen, to understand and to answer the questions

Page 6

I'm asking?
A. No.
Q. Are you today suffering from any ailments, physical or mental, that you believe may inhibit your ability to listen, to understand and answer the questions I'm asking?
A. No.
Q. Okay. You are appearing today in this proceeding pro se, is that correct?
A. That is correct.
Q. So you have no attorney with you?
A. No, I don't.
Q. You understand that in litigation you are entitled to have an attorney representing you, is that correct?
A. If I choose to and if I have the money to afford one, I think that would have been correct.
Q. But you do understand that you are proceeding today on your own and that you're willing to go forward today without an attorney?
A. That is correct.
Q. Okay.
MR. SCHMIDT: Can we have this marked please. Why don't we just mark them Exhibit 1 through. It doesn't have to be

Page 7

plaintiff or defendant.
(Resume, is received and marked as Exhibit 1 for Identification.)
Q. Mr. Horton, I'm going to show you a document which we marked Exhibit 1 for identification, and except for the top mail lines, as it appears to be an e-mail, do you recognize, can you identify the remainder of this document?
A. Yes, I do recognize and I can identify the remainder of this document.
Q. Can you tell me what it is please?
A. It appears to be my resume.
Q. Is this the resume that you forwarded to Ross University by e-mail attachment on January 13, 2003?
A. It would appear to be, yes.
Q. Any question as to whether it is or it is not?
A. I don't have 100 percent recollection as to it, but this would appear in substance to be the resume that I sent.
Q. I'd like to go over it if I could. Start with your education. From this resume am I correct that you attended Cameron University in Oklahoma?

Page 8

A. Yes, sir.
Q. And you received a Bachelor's of Arts degree in 1982?
A. That is correct.
Q. Subsequent to receiving that degree, did you go directly to graduate school for your Master's of Science or did you go to law school?
A. That is a good question, as that was twenty years ago. I believe I began my Master's degree in June of '82 right after I graduated in May of '82 from Cameron University, and then I started in on my Master's in June of '82.
Q. At the University of Oklahoma?
A. Yes.
Q. Did you then go on to law school after completing your Master's degree in library science?
A. No. Actually, the Master's degree was pending. I would say as it states there, I didn't receive it till '85. And then I began University of Oklahoma Law School I believe in '83, or -- excuse me. Actually, I went to Oklahoma City University Law School in September of '83. Went for one semester. And I believe University of

Page 9

Oklahoma I must have started there in September of '85. So actually once I graduated from University of Oklahoma I got my Master's degree in '85 and then I begin University of Oklahoma Law School in September of '85. That's it. I tried to establish a time line. I'm -- I'm -- it's been a while. Twenty years, you know.
Q. According to your resume, you completed 65 credit hours toward your law degree, is that correct?
A. Yes.
Q. Do you know how many credits you needed to graduate with a law degree?
A. I believe it's usually 90, so --
Q. Is there any reason that you stopped your education in law school?
A. There were exigencies and circumstances, financial, primarily family, other things along those lines which made it impracticable for me to continue.
Q. Going forward with the resume, it appears that the next job you had after getting your Master's in law school as working for the IRS, which was from April 1988 through November 1989.

A. Correct.
Q. Was there a gap in time between your law school education and the time you first began working for the IRS?
A. Well, I -- I believe law school ended in '87 maybe, and then I was maybe living at home for a year and then more exigencies. I'm off to Seattle to work for the IRS.
Q. What did you do for that year that you were living at home?
A. Just stayed with mother, you know, to get things moving.
Q. When you worked for the IRS for, it appears, oh, sixteen, seventeen months?
A. Correct.
Q. What were the reasons for leaving the IRS?
A. Let me check. Let's see what the next job says. Oh, again, I probably should explain that this resume is not necessarily comprehensive, but I -- let's just say I had a job working somewhere else which was not on this.
Q. Where did you work?
A. It was El Toro Marine Corps Air Station in California.

Q. For how long did you work there?
A. I believe I was there for six months.
Q. From when to when?
A. Let's see. Probably based on this, we'll say December of '89 to June of '90.
Q. So you worked for them, approximately, six months?
A. Correct.
Q. What position did you have there?
A. Assistant librarian.
Q. What type of librarian?
A. It was their recreation services library.
Q. And why did you leave that position in June of '90?
A. Other exigencies and circumstances.
Q. And then it's fair to say you didn't get another position until February of 1992?
A. I was probably working in Seattle for different companies --
Q. Okay.
A. -- at that point. I believe I returned to Seattle from '90 to '92.
Q. And the other instruction I failed to give you is that I don't want you to guess

unless you tell us. So if you're not certain, just tell us you don't recall.
A. Okay. If that's acceptable. Obviously, these things are from twenty years ago, so I'm kind of -- ten years ago. Maybe fifteen years ago.
Q. So then between El Toro Marine Corps Air Station and obtaining employment with the Royal Saudi Naval Forces, is it fair to say you had odd jobs?
A. Temporary jobs. Casual labor. Odd jobs, maybe that would be it.
Q. Nothing that was --
A. Worth putting on a resume.
Q. Then you went to Saudi Arabia and you worked there for two years, is that correct?
A. Right.
Q. Was that pursuant to some government program or was that a job that you simply sought out and were hired directly by the Saudi Royal Air Forces?
A. No. There was a recruiter. They put a paper in the Seattle or they put an advertisement in the Seattle Times newspaper and they had some kind of -- some libary-type job and I responded

and they hired me, so I was over there.
Q. For two years?
A. For two years.
Q. And why did you leave that position?
A. Well, it was a contract position and two years was pretty much enough for me.
Q. You left there in February of 1994, and according to your resume it doesn't appear that your next job was until October 1997?
A. That is correct.
Q. What did you do during that two and a half-year period of time?
A. Well, I just kind of lived in Seattle. I did bring back a little bit of money with me, and so it was not necessary for me to work at that point, so I didn't.
Q. And you went to work again, it appears as a librarian, working for the Society of Saint Pius the X Roman Catholic Religious Order?
A. Correct.
Q. You worked there for, approximately, ten months?
A. Correct.
Q. And why did you leave that

position?
A. Well, it was a temporary position. It was sort of designed to see if I was interested in studying for the priesthood, and I believe the determination was made that I was not going to be studying for the priesthood for their religious order, and so it was time to move on.
Q. Let me see if I understand your answer then. When you first took employment you had an understanding that you were going there to see if you might be interested in joining the priesthood?
A. Right. Right. There was a religious component to that as well as the library side to that.
Q. You left there in 1998 and you took a job with Huron University library in September of '98, is that correct?
A. Yes.
Q. And you worked there it appears for six months?
A. Correct.
Q. Why did you leave there in six months?
A. The best of my recollection, their

institution was financially strapped. It was privately funded and they had a mass layoff in March of '99, in which myself and a number of other people were just essentially laid off. And based on the history of Huron University, they had laid off previous five -- I know from the library side of the house, the previous, I'm going to say, five librarians every year. They'd hired them for the first semester. You get halfway through the spring semester, they'd run out of money and then they'd lay off the librarians. So it just seemed to be a practice or pattern of Huron University to lay off people in March.
Q. When did you learn of that practice or pattern?
A. Probably in January. I had an opportunity to speak to the former librarian there, and she had actually lived in my town, in Hoven, South Dakota, for a number of years. And originally Huron University was a presbyterian school and they had some state funding and then it went into private hands I guess in the '70s. And ever since then it's just been a hand-to-mouth existence from student loan money being disbursed in September of an academic year, and then they run out of the

student loan money around March and then they do their massive layoff of staff and budget cutting until they can get more funding in the following September. So I found out about that after the fact, but that's just how they operated over there, so --
Q. Then it appears you were out of work for, approximately, five months.
A. Correct.
Q. And you took a job at Shaw Air Force Base?
A. Yes.
Q. Where? In South Carolina?
A. Correct.
Q. Working it appears to be in the medical resource center and library?
A. Correct.
Q. As the director?
A. I believe that's the title of the job.
Q. How many people were you directing?
A. Directing myself there.
Q. So it was a one-person position?
A. That is correct.
Q. And you stayed there for approximately seven months?

A. Seven months, correct.
Q. Why is it that you left there after seven months?
A. Oh, I believe I resigned to look for other opportunities.
Q. Were you asked to leave or was it a voluntary --
A. I believe the final determination was that I simply resigned.
Q. What do you mean final determination?
A. Well, you know, the government is bureaucratic, and they have the final determination on what is called the standard Form 50, which is the personal action that denominates, you know, your coming and going. They hire you through ASF 50. They retire you or let you go through ASF 50. And the final ASF 50 states that it was a resignation action.
Q. Did they eliminate your position completely or were you asked to resign?
A. I think I could just say that I resigned for my own reasons, and that's how it's documented.
Q. And what were the reasons?

A. Looking for other opportunities outside of South Carolina.
Q. Did you have something lined up when you left?
A. Well, let's see. Let me check. I did not, so no. It was just -- I don't know. It was so hot down there and humid. It was terrible. So it's unhealthy for me.
Q. Not too much different than what the island of Dominica would be like?
A. That's true too but they paid a lot more.
Q. Then you went for a period of about two years and three months without employment, is that correct?
A. Yes. That would appear to be so.
Q. And you took a job with West Point?
A. Yes.
Q. Can we assume that as of this time period through the time you worked at West Point the only medical library you worked in was the Shaw Air Force Base library?
A. That is correct.
Q. And you worked at West Point for two months?
A. Two months, yes.

Q. Why is it that you were only there for two months?
A. I found the cost of living to be prohibitive on a 20-hour-a-week position.
Q. So this was a part-time position?
A. As it so states hours per week 20.
Q. Did you relocate then back to the West Coast after you left West Point?
A. Yes.
Q. For the two years between Shaw Air Force Base and West Point, had you gone back to the West Coast?
A. Let's see. Yes, I did.
Q. So then you relocated back to the West Coast after West Point in August of 2002?
A. Let me see. Yes, approximately, August 2002.
Q. And you were unemployed until you applied for the, well, several positions at that point one being at Ross University, is that correct?
A. Correct.
Q. Okay. So then as of the time you applied for a position at Ross University you had seven months experience working in a medical

library?
A. Yes. That would appear to be correct.
MR. SCHMIDT: Mark this.
(On-line job posting, is received and marked as Exhibit 2 for Identification.)
Q. I'll show you what's been marked as Exhibit 2, and I'll represent to you that this was Ross University's on-line job posting. Now, this one, it indicates that it was posted in April 2003.
A. Correct.
Q. Do you recall whether this was similar to the first job posting you saw on line?
A. I would question whether I even saw this on line. I believe I saw this in the print edition of the Chronicle of Higher Education, so -- but in substance, the salary and the description is the same. But I saw it on -- not on this particular web site. They had it published in the Chronicle of Higher Education, which is a newspaper that has an employment section in addition to other things, so --
Q. Now, you applied for a position by forwarding Ross University a copy of your resume,

correct?
A. Yes.
Q. Do you think you met the requirements for the job?
A. I met the basic requirements I think.
Q. Did you have five to eight years of professional experience in an academic research or medical school in a library setting?
A. No, I did not.
Q. Did you have three to five years of experience supervising professional librarians or library support staff?
A. No.
Q. What is it that caused you then to think that you met the basic requirements for the position?
A. Well, my consideration was the location in Dominica. I didn't feel that there were going to be that many applicants for the position. Obviously, in the requirements section of the vacancy announcement or the job description, they put the Master's degree in library science as the first requirement and everything else, although it calls them requirements, well, I'm not sure if they were ever going to find anyone quite of what

they want.
Q. Regardless of what you think --
A. Yes.
Q. -- did you have any discussions with anybody about you meeting the requirements for the job posting?
A. Well, I eventually talked to Dr. Rios and he invited me in for an interview in Dominica. So evidently he felt that I was at least good enough to at least go for the interview.
Q. At that point do you know how many candidates they had applying for the position?
A. Well, no, I don't have any idea.
Q. Do you know whether he reviewed your resume at the time that he invited you for the interview?
A. I would assume he read some of it. I -- I wasn't looking over his shoulders. So, no, I couldn't say exactly what he was doing down there. But essentially he invited me for an interview. So I was under the impression at least he thought I met the basic requirements for the position, so --
Q. Did you ever ask him that question?
A. Well, we did the interview. We discussed

my background. He seemed satisfied with my background. And then invited me into an in-person, let's-go-fly-away-to-the-Caribbean interview. And obviously they booked the flight and did everything. And then Ms. Fried somehow jumped into the work hire and she kind of put the kibosh on everything. So my concern is, Number one, what exactly is she doing trying to stop him from interviewing me. I mean, the best situation -- I'm not going to give legal advice to you or your client, but once they make the committment to do the interview and book the flight, they should just go ahead and do the interview and then say they picked somebody else, but for them to just yank the interview seemed very suspect to me, and so basically that's why we're here. I mean --
Q. Okay.
A. In fact, they didn't even have --
Q. Let me interrupt you a second, Mr. Horton, although I said I would not. You will have your chance to get on your soap box and to make any statements you want if this case gets to trial.
A. Okay.

Q. Today you're supposed to answer my questions. This is not a free-for-all.
A. Okay.
Q. What your suppositions may be or what you suspect is not the questions that I ask. I asked you very simply did Dr. Rios ever tell you you met the qualifications for the job.
A. Yes.
Q. I want to know to the best of your recollection what he told you about meeting the qualifications for the job.
A. Well, just the fact they invited me in for an in-person interview clearly implies that I felt I met the basic qualifications.
Q. So then it's fair to assume they never said anything about your qualifications, you are implying that from the fact they invited you for an interview?
A. Well, we talked --
Q. Yes or no, sir?
A. Could you repeat the question.
MR. SCHMIDT: Can you repeat the question, please.
(Requested portion is read back by the reporter.)

A. No. We discussed my qualifications. He was satisfied with my qualifications. He invited me for an in-person interview in Dominica.
Q. Did he use that language, that he was satisfied with your qualifications?
A. Yes.
Q. Did he discuss with you the fact that you did not have more than two months prior experience working in a medical library?
A. I believe I have six months.
(E-mails, are received and marked as Defendant's Exhibit 3 for Identification.)
Q. I stand corrected. Did he discuss with you that you only had seven months of experience working in a medical library?
A. We discussed my resume. He was satisfied with everything on the resume, and he invited me in for an in-person interview.
Q. How do you know he was satisfied with everything? Did he say that to you?
A. Yes.
Q. He said I am satisfied with your resume?
A. Well, to the best of my recollection, this

again is two, three years ago now, we discussed the resume. Ordinarily you would not invite someone to travel, you know, from Seattle to this side of the country, it's 2,500 miles. And then down to Dominica I think it's another 2000 miles. You wouldn't book someone on an essentially 4 or 5,000-mile flight unless you were serious about their candidacy and you were satisfied with their credentials.

Q. That's your assumption, correct?

A. Well, he's the one who booked the flight.

Q. That's your assumption?

A. No. Rios and his group down in Dominica booked the flight. That clearly states they were.

Q. It's no question they booked the flight, but they never said to you using those words that we're satisfied, that you're qualified for the position, is that fair?

A. No, that's not fair, because I had the interview with Dr. Rios over the phone. He had my resume right in front of him. If he didn't like the resume he would have not even had the interview over the phone. So the fact that we even had the interview over the phone is an indication that there was enough there for them to

be satisfied to go forward with the application, interview process. So, I mean, the onus is on your client that they made all the moves.

Q. Sir, you're not preaching to a jury. Don't tell me what the onus is. That's not the question that's pending.

A. Okay.

Q. Now, if we go back to Exhibit Number 1 for a second, can you tell me why you placed on your resume the fact that you are a hispanic minority male over the age of 40 years?

A. Some companies want to know that sort of thing for EEO and diversity and affirmative action purposes.

Q. What is your hispanic background because, I hate to say and I don't mean to be rude, but you don't appear to be hispanic as we sit here?

A. Well, my mother is half, which makes me a quarter. So if you want to go dig her up, her side of the family.

Q. Your mother is half what?

A. Hispanic.

Q. Spain hispanic?

A. Mexico hispanic.

Q. Your mother's one half Mexican descent?

A. Right.

Q. Okay. Your father was not Mexican?

A. No.

Q. So you're one quarter Mexican?

A. Yes.

Q. And you believe that qualifies you as hispanic minority?

A. Yes.

Q. I'm going to show you what's been marked as Exhibit 3 and ask you if you can identify that series of e-mails?

A. From. To. It appears to be e-mails between or from Dr. Rios to myself carbon copied to Ms. Fried. Let's see. All right. Yes, I recall these.

Q. Let's start with the first one on top that is dated Tuesday, January 21, 2003 at 4:40 p.m. from Dr. Rios to you. The third sentence of that e-mail says, "I see that you have lived and worked in Dominica, so you're familiar with the island and perhaps the school." Did you ever live in Dominica?

A. No, I have not.

Q. From where did he get that information? Do you know?

A. I would assume he confused me with somebody else.

Q. Did you ever tell him you were in the Peace Corps?

A. No.

Q. So you never made these representations to him?

A. No.

Q. He may have confused you with somebody else then, correct?

A. Possibly or -- I don't know hold he is. I think he's in his 60s or 70s maybe, and that may have contributed to the situation.

Q. Why, are you suggesting he's suffering from dementia of some type?

A. No, but at that age you've met so many people. It's hard to keep track of everybody.

Q. Okay.

MR. SCHMIDT: We'll have this marked please.

(E-mails, are received and marked as Defendant's Exhibit 4 for Identification.)

Q. Let me show you what's been marked as Exhibit 4 and ask you if you can identify those as a series of e-mails?
A. I recall these, yes.
Q. And they're e-mails between yourself, Michelle Fried and Dr. Rios?
A. Correct.
Q. Okay. If we go to Page 2, which is really the first to go backwards on these, it appears that there was some initial discussions about setting up a telephone interview, is that correct?
A. Correct.
Q. And that was apparently done. And then on the 21st of January 2004 you write to Dr. Rios, "Any word on my flight to Dominica. I haven't heard from your travel agent." Had he made an offer to you for a job interview in Dominica over the telephone --
A. Yes.
Q. -- sometime between the 15th and the 21st of January?
A. Well, when we had our phone interview he said, "Okay. I want you to come and do an in-person interview." So we did the phone

interview and then he -- right there he said, "Okay. I want you to come and do the in-person interview." So that's where we were at. So he made, I guess, what you call it, the offer, at that point, and I accepted the offer. And all the booking arrangements were made with the travel agent and everything looked really good there for a while.
Q. You thought you were going to get a trip to Dominica?
A. Well, I was all ready to go. The bags were packed. I put the cat out. Everything was looking good.
MR. SCHMIDT: This is Number 5 please.
(E-mails, are received and marked as Defendant's Exhibit 5 for Identification.)
Q. Now, is Exhibit 5 again a series of e-mails concerning your reservations?
A. Correct.
Q. The bottom e-mail appears to be -- the first e-mail appears to be from Michelle Fried to you talking about the arrangements and that you have to go to the travel agency, correct?

A. Let's see. I don't recall having to go to the travel agency. I mean, obviously, I'm in Seattle. The travel agent is in Dominica.
Q. Contacted?
A. Contact. Okay. I believe they just wanted me to confirm and I was, look, well, they're making all the arrangements, so there's really nothing for me to confirm what they want to set up. I'm just totally available.
Q. You had an e-mail to Michelle Fried with a number of questions concerning the ammenities for the trip. Cost. How many nights. Whether the meals would be included. So forth and so on.
A. Right. I was basically trying to plan out that week, exactly how long they were going to have me down there and, you know, probably expenses were going to be shared. How much money I had to bring with me or available.
Q. Now, the trip was cancelled, correct?
A. Yes.
Q. One of the things you've alleged in this lawsuit is that you relied on that statement to cancel an interview, is that correct?

A. Yes.
Q. And the interview was with another school somewhere in -- I'm not sure where it was located. Where was the school located?
A. The Seattle area. The specific town is Renton. Renton, Washington.
Q. When is it that you had the interview scheduled for Renton, Washington?
A. As I recall, it would have been coextensive or at least the week of the trip to Dominica.
Q. In January?
A. Correct.
Q. Okay.
MR. SCHMIDT: If we can have this marked please.
(Interrogatories, are received and marked as Defendant's Exhibit 6 for Identification.)
Q. I'm going to show you a document which was marked Exhibit 6. I'm going to represent to you these were your responses to our written interrogatories or written questions that we posed to you.
Do you recognize this document?
A. Yes, I do.

Q. Okay. There is attached Exhibit A1, and this is presumably an e-mail correspondence you had with the admissions office at the school for which you applied for a position.
A. This would have been the human resources office I believe.
Q. Human resources. I apologize. And what university was this?
A. Rent ten Technical College.
Q. Is there any reference to that on this document at all?
A. Well, under the job description they obviously list, you know, application deadline to rent ten Technical College. That would be A3. The application deadline and where to mail --
Q. But there's no e-mail that talks about rent ten College, does it?
A. Well, the address -- the e-mail address is RTC. -- RTC.EDU.
Q. And according to this, this is an e-mail exchange that you had in January of this year with this woman in human resources department?
A. Correct.

Q. And you e-mailed her asking to confirm the fact that you had sent a resume in and had been offered an interview, correct?
A. Yes.
Q. The first e-mail in the bottom of the page which is from Glenda Mullowney, it's M-u-l-l-o-w-n-e-y, if that's how it's pronounced, indicates that you applied for this position in December of 2002, correct?
A. Yes.
Q. And it says you then withdrew your application, correct?
A. Yes.
Q. You then indicated or asked her if the school would confirm that you were offered an interview?
A. Correct.
Q. And she responds it looks like you were selected for an interview and you declined?
A. Correct.
Q. It doesn't say when, though, does it?
A. Well, that would be the only reason. I mean, I specifically recall that my interview with Renton Technical College was going to be on the

same week that the trip had been booked and so --
Q. Is there any reason that you didn't try and reschedule?
A. Well, at the time the Dominica position looked so promising that I was trying to put all my eggs in that basket.
Q. Nobody told you that you would be offered a job when you went down there, did they?
A. Well, I never got down there, but the telephone call with Dr. Rios was just very, very positive.
Q. He didn't offer you a position, did he? Did he?
A. Well, it seemed like we were almost there.
Q. Did he offer you a position?
A. He did not offer me a position no, but --
Q. Now, with this Renton University --
A. Technical College.
Q. -- Technical College did you try to get another interview with them?
A. No, I did not.
Q. Why not?
A. I felt that the Dominica position was in the bag.
Q. Well, what about after you came

back from -- when you learned that your trip to Dominica had been cancelled?
A. I had no reason to believe that the Dominica position was going to be put on hold indefinitely.
Q. You were interviewing for other positions during that period of time, weren't you?
A. I believe so, yes.
Q. In fact, you interviewed for a position with the Veterans Health Administration in Philadelphia at about that time, didn't you?
A. Probably back in December or November.
Q. Okay. Now, we are into the end of January of 2003, correct?
A. Yes.
Q. Had you accepted the position with the Veterans Administration before you decided to apply to Dominica University or Ross University rather, in Dominica for a position?
A. I don't recall.
MR. SCHMIDT: Can we have this marked please.
(Resume, is received and marked as Defendant's Exhibit 7 for Identification.)
Q. Do you recognize that document?

A. Yes, I do.
Q. This is a second resume that you sent to the school, correct?
A. Yes, it appears to be.
Q. Dated February 18, 2003, correct?
A. Correct.
Q. And it indicates that you were already working at the Veterans Health Administration Medical Center in Philadelphia?
A. That is correct.
Q. So I will ask you again, do you recall whether you accepted a job with the Veterans Health Administration prior to January 22, 2003 when you decided to take a trip to Dominica?
A. I do not recall specifically when I accepted the job at the Veterans Health Administration, but it would be fair to say that it would have been in January or February of that year?
Q. Had you decided to take the job interview in Dominica because you wanted to take a short vacation before you started working in Philadelphia?
A. No, because, again, per the position

description for the Dominica position, I believe it was 70,000 a year, and this thing was just 35,000 a year. So I would have been more than happy to stay in Dominica.
Q. When you first talked to Dr. Rios did you tell him that you had accepted a position beginning in February at the Veterans Health Administration Medical Center?
A. As I recall, I was not 100 percent sure whether I was going to be working there obviously if at any point I could have cancelled the offer from the Veterans Administration. And it was certainly my intention to be working in Dominica and not be working in Philadelphia, but as circumstances turned out Dominica kind of fell through on me.
Q. Let's get back to this Renton University again just for a second. Do you have any documents at all, any records at all, that indicate when your interview had been scheduled with Renton?
A. The only documents -- well, the only thing I can bring up is that the only reason I would have cancelled it is that it would have conflicted with the Dominica situation.

Q. Now, answer my question please.
A. Okay. Repeat your question for me.
MR. SCHMIDT: Just read it back.
(Requested portion is read back by the reporter.)
A. Again, I will just state that the documents from the human resources at the college are all that I have available at this time, but I believe to the best of my recollection the proposed trip to Dominica and the interview with Renton Technical College were definitely all on the same week.
Q. But you have no documents to substantiate --
A. I don't think I have it with me. I'm sure I can dig something up from Renton and they can verify that.
(Resume, is received and marked as Defendant's Exhibit 8 for Identification.)
Q. Take a look at Exhibit 8 please. This appears to be another copy of your resume that was forwarded to Ross University.
A. Correct.
Q. And this appears to be one that was sent in August of 2003, correct?

A. Correct.
Q. Again, inquiring as to a position as the medical librarian?
A. Correct.
Q. Now, this indicates that you worked at the Veterans Health Administration Medical Center library for four months?
A. Yes.
Q. And why is it that you were only there for four months?
A. I believe they had some problems with my paperwork.
Q. And what problem did they have with your paperwork?
A. They were not specific with me about that.
Q. The problem with your work product or with your background check?
A. I don't know. I think they offered me a position which they didn't have the authority to offer me based on federal reinstatement illegibility and other exoteric things. So they sort of tried back.
Q. What do you mean federal reinstatement illegibility?
A. Well, apparently there were other federal

employees who were hired on the register and that they had inadvertently offered the position to me when they should have given it to someone else. And evidently whoever that other person was made that fact known at which point I believe it was incumbent upon them at that point to draw that position from me and offer it to the other candidate.

Q. And did somebody tell you this?

A. That's how it was brought to me, yes.

Q. Who was it that brought that to your attention, the name of the person?

A. The name of the person I guess it would be -- we'll say Joseph Lytle.

Q. At human resources at the Veterans Administration?

A. Yes, Veterans Health Administration.

Q. Now, in the course from 1988 forward through August of 2003 it appears that you had six or seven positions, the longest one being for two years in Saudi Arabia. The remaining ones somewhere between four and ten months, is that correct?

A. Yes.

Q. And I think your testimony was that

with each of them there was an employer's reason why they had to let you go?

A. I wouldn't put it that way.

Q. Did any of them terminate your employment because of poor performance?

A. No.

Q. Because of an inability of you to interact properly with other personnel?

A. I don't recall that.

Q. Okay. You obviously relocated to the Philadelphia area when you took this position at the Veterans Health Administration, is that correct?

A. Yes.

Q. And then you relocated there from the Philadelphia position to New Jersey?

A. I basically have always been in New Jersey since coming out here, in I believe all or, excuse me, February of 2003.

Q. You remained in New Jersey since that time?

A. Right.

Q. Then as I understand in August of 2003 sometime shortly after you sent this e-mail with your updated resume, you actually went to

Ross University's location in Edison, New Jersey, correct?

A. Yes.

Q. And you went without an appointment, is that correct?

A. That is correct.

Q. Walked in. What happened when you got there?

A. I just asked to see someone in human resources to inquire about my candedacy. That was -- the last thing I had received from the university was an e-mail notifying me that the trip to Dominica had been put on hold because of budgetary reconsiderations on the university's part, but that the trip would be rescheduled at a later date and that they would be in touch. So I believe prior to when that -- prior to me physically going up there in August of 2003. I at least sent maybe a couple of e-mails inquiring about the status of the, you know, the trip to Dominica, but for some reason they were giving me the cold shoulder and just, you know, weren't laying all their cards on the table.

Q. Did you raise your voice when you were in the reception area?

A. No. I just -- I just asked to see whoever was in charge of human resources or whoever was available to see me and, you know, if I could get some clarification on my situation with Ross.

Q. Did the receptionist tell you that there was no one available to meet with you?

A. Well, she might have told me that, yes, but I knew that as a person who by the virtue of having received the last e-mail stating that I'm still going to be interviewed that I had some kind of interest in finding out when the interview was going to take place, when the trip was going to be, the flight, etc. So my purpose in being there was to speak with someone or find out what exactly was the status of my candedacy with the university. I assume they have people there who can, you know, fill you in on those type of things. But the lady, how can I say this, very delicately seemed to want to play little games and, you know, I just wanted to find out am I still a candidate, am I not a candidate. Have you terminated my candedacy. Why not. Just say, well, you're no longer a candidate. She -- so -- so she wanted me to go and find a telephone and call someone within the office there to make an