Page 46

1  appointment, and I just asked her, well, why don't
2  we just make the appointment right now, you know.
3  She said, "Oh, no, I can't make an appointment for
4  you. You have to call this number," as if they
5  have some kind of central scheduling appointment
6  system and, you know, it all -- you know, it
7  seemed very strange. And the fact that, you know,
8  they promised to fly me down to Dominica back in
9  January and here it was August and then, you know,
10  it was pretty obvious that they were up to
11  something.
12      Q.    And did they ultimately ask you to
13  leave the office?
14  A.    Well, they were getting nasty. Yes. I
15  could see there was a bit of nastiness going on.
16  I mean --
17      Q.    Was that in response to hostility
18  displayed by you?
19  A.    I wasn't hostile. I was just there as an
20  applicant who they said was going to be traveling
21  to Dominica. And I just wanted to confirm or
22  otherwise get clarification as I had previously
23  sent them an e-mail. I believe I may have written
24  a letter. I don't recall specifically, but I
25  mean, I was certainly going up there to -- Edison

Page 47

1  wasn't my first intention. And as circumstances
2  later revealed, well, this whole thing of
3  deferring my trip was all a big charade to begin
4  with. They had -- Ms. Fried had essentially
5  strong armed Dr. Rios into cancelling the whole
6  thing.
7      Q.    And how do you know she strong
8  armed Dr. Rios into cancelling the whole thing?
9  A.    Well, he was all on the go side of it and
10  then she was all on the nay-nay side of it. I
11  believe she complained about my address in
12  Washington State. She was unhappy with my
13  telephone situation. And based on those two
14  things, she decided -- decided that she was going
15  to interject herself.
16      Q.    How do you know what she decided
17  on? Did she tell you?
18  A.    Well, I believe --
19      Q.    Yes or no, sir, did she tell you
20  what she made her decision on?
21  A.    I got copies of her e-mails.
22      Q.    Did you ever have discussions with
23  her?
24  A.    I have her e-mails which indicate what she
25  was doing to Dr. Rios in terms of --

Page 48

1      Q.    Amongst other things, sir, her
2  e-mails say that the travel agent complained about
3  your demeanor on the telephone, correct?
4  A.    I don't really recall ever speaking to the
5  travel agent. I mean, they were supposed to make
6  all the arrangements. I never even spoke to the
7  guys. So that was just all a hearing out of
8  nowhere.
9      Q.    Let's go back to your answers to
10  your interrogatories just for a second. In your
11  answers to interrogatories, if I can find them,
12  and these are the questions that we posed. Other
13  than speaking with Dr. Rios, did you speak with
14  anyone else at any time at Ross University with
15  the exception of the receptionist?
16  A.    I don't recall, no.
17      Q.    Okay. Now, interrogatory Number 10
18  asks you to identify any legal actions which you
19  may have been a party and which arose out of your
20  employment or any aspect of employment with any
21  other employer. You've objected to relevance. I
22  will tell you that is not a valid objection to
23  this question. You have filed an employment
24  discrimination matter and I'm entitled to that
25  information. If you could answer it for me today

Page 49

1  I'd appreciate it.
2  A.    I believe if you look on West Law you might
3  find a number of actions that I filed in the past,
4  yes.
5      Q.    And who did you file with? Were
6  they employment actions?
7  A.    Primarily, yes.
8      Q.    Against who?
9  A.    Generally the Federal Government and Huron
10  University.
11      Q.    And the Federal Government?
12  A.    Yes.
13      Q.    How many times have you filed suit
14  against the Federal Government?
15  A.    I don't recall that number.
16      Q.    More than twice?
17  A.    Yes.
18      Q.    More than five times?
19  A.    Yes.
20      Q.    You weren't employed with more than
21  three agencies. How did you file five employment
22  actions?
23  A.    It happens. It just happens.
24      Q.    Were you successful in any of those
25  litigations?

Page 50

1  A.    Yes.  To a certain extent.
2        Q.    Did you collect money damages in
3  any of those?
4  A.    No, no money damages.
5        Q.    Ever reinstated to positions?
6  A.    No.
7        Q.    If I understand you correctly, and
8  since you've had some legal training you
9  understand what I'm saying, you're indicating to
10 me that these are cited decisions?
11 A.    I can tell you that other attorneys similar
12 to yourself have been on West Law and they've
13 managed to pull up things I had no idea were on
14 there, so --
15       Q.    Where were the actions filed?  In
16 other words, in what court were the actions filed
17 against Huron University?
18 A.    In Huron University.  Let's see.  Let me
19 try to remember that one.  Well, I guess it would
20 be -- it would have to be the district of -- I
21 really don't know.
22       Q.    South Dakota?
23 A.    In the district of South Dakota.  It would
24 have been in federal court.
25       Q.    How about the Federal Government,

Page 51

1  which courts were they in?
2  A.    At this point most of litigation is
3  primarily in the eastern district of South
4  Carolina.
5        Q.    Is that the only district?
6  A.    Right.  At the top of my head that is
7  correct.  Eastern district of Pennsylvania.
8        Q.    So it's fair to say that based upon
9  what you're telling me here, you filed suit
10 against every employer you've ever worked for?
11 A.    I wouldn't go that far, but there have been
12 issues, yes.
13       Q.    Have you filed suit against any
14 employers who have not given you a job?
15 A.    That's a good question.  Possibly if I felt
16 there was an -- if I felt there was an element of
17 discrimination.
18       Q.    Who were the employers that you
19 sued?
20 A.    I couldn't -- right off the top of my head
21 I couldn't say.
22       Q.    Have you always prosecuted these
23 suits pro se?
24 A.    Generally, yes.  Yes.
25       Q.    Have you ever had an attorney

Page 52

1  representing you in any of these litigations?
2  A.    No.
3        Q.    Number 11 asked you to identify any
4  criminal charges that may have been filed against
5  you.  Have there been any?
6  A.    Again, I would object to relevancy.  I
7  don't think we --
8        Q.    Well, quite frankly, I'm entitled
9  to the information, particularly if the crimes
10 deal with anything to do with your veracity,
11 truth, and certainty.  That is obviously relevant
12 information.
13 A.    Well, I can say the only thing on NCIC at
14 this point is an obstruction charge and conviction
15 out of Seattle, and apparently there's nothing
16 else there.
17       Q.    Obstruction of justice?
18 A.    Of a police officer, yes, and that would
19 have been about 1988.
20       Q.    You've also indicated in your
21 complaint that you have suffered -- I'll read it
22 to you.
23            MR. SCHMIDT:  May I have this
24 marked so Mr. Horton can see it.
25            (Complaint, is received and marked

Page 53

1            as Defendant's Exhibit 9 for
2            Identification.)
3        Q.    You filed a complaint for a
4  violation of 42 USC 2000E, which is the Title 7 of
5  the Civil Rights Act which entitled you to a
6  motion of distress, damages.  And you've also
7  claimed in your injuries that you've been greatly
8  humiliated in not being treated by other
9  applicants.  So you put your mental state and
10 condition as an issue.
11 A.    All right.
12       Q.    So I'd like you to go back and
13 identify or answer Question 12 for me,
14 Interrogatory 12.  It asked you to identify
15 physicians or other health care providers who
16 treated you for medical or psychological reasons
17 during the past five years, if any.
18 A.    I believe that would be none.
19       Q.    Have you ever been treated for any
20 psychiatric or psychological ailments?
21 A.    No.
22       Q.    Who have you worked for, if anyone,
23 since leaving the employ of the Veterans
24 Administration in Philadelphia?
25 A.    Primarily with the Labor Ready Temporary

14 (Pages 50 to 53)

Page 54

1   Service in Trenton, New Jersey.
2       Q.      Labor Ready Temp --
3   A.    Temporary.
4       Q.      -- Service in Trenton?
5   A.    Correct.
6       Q.      What's the nature of the work
7   you've done?
8   A.    Just any matter of casual labor.
9       Q.      Well, casual labor could be
10  anything from working for a warehouse operation to
11  an office setting.  What type of work?
12  A.    Done both of those.  It varies everyday
13  practically.
14      Q.      They send you out everyday?
15  A.    No.
16      Q.      Okay.  You've had no other
17  permanent employment since that --
18  A.    No.
19      Q.      -- time?  Okay.  Let's go to your
20  complaint for a second, the document that's marked
21  Exhibit 9.  According to the complaint, Paragraph
22  2 reads, "At the conclusion of the telephone
23  interview Dr. Rios offered the plaintiff an
24  in-person, all-expense-paid trip to the Dominica
25  campus to complete the interview process.

Page 55

1   Plaintiff accepted the offer and in consideration
2   of that cleared his schedule so he would be
3   available for the trip which was scheduled for the
4   first week of February 2003.  In detrimental
5   reliance on the offer, acceptance and
6   consideration for the interview trip to Dominica,
7   the plaintiff declined an offer to interview for a
8   library director position with a community college
9   in Seattle, Washington which also paid $70,000.00
10  per year."
11      Did I read that correctly?
12  A.    Yes.
13      Q.      According to this, the trip was
14  supposed to be the first week in February,
15  correct?
16  A.    That was my recollection.
17      Q.      Your resume that was sent to Ross
18  University on February 18 --
19  A.    Right.
20      Q.      -- indicates that you were already
21  working for the Veterans Administration, correct?
22  A.    I believe if the interview had gone on --
23  the Veterans Administration position was the third
24  week.  It was scheduled to start for the third
25  week -- third or fourth week of February.

Page 56

1       Q.      Well, your e-mail says that you
2   sent it on February 18.
3   A.    Right.
4       Q.      And it says you were already
5   working there.  Is that a misrepresentation?
6   A.    Well, I don't know.  Maybe you can show me
7   exactly what we're talking about here.
8       Q.      May I see the documents please.
9   A.    According to this, it says 2-03, which
10  indicates I began working at the Veterans
11  Administration in February of 2003.  It doesn't
12  state what specific week or day I started on.
13      Q.      Well, you're the gentleman who
14  likes implications and assumptions, and if you
15  send someone a resume indicating that you began a
16  job in February, wouldn't there be the assumption
17  made by the employer that you're currently working
18  there?  Wouldn't that be a fair assumption?
19  A.    It could be.
20      Q.      Now, in your complaint you talk
21  about an all-expense-paid trip to Dominica?
22  A.    Yes.
23      Q.      So I'm going to ask you again, did
24  you intend to go down there for vacation before
25  beginning work with the Veterans Administration?

Page 57

1   A.    No.  I intended on staying there if they'd
2   let me.
3       Q.      If your home town was in the
4   Seattle, Washington area and a community college
5   in Seattle was willing to pay you the same amount
6   as was going to be paid in Dominica, why would you
7   go to Dominica for a job particularly when you
8   didn't like the hot weather?
9   A.    Well, the tax implications are extremely
10  favorable to be working off shore as, you know,
11  probably the first -- at least it used to be the
12  first $70,000.00 worth of income is exempt from
13  taxation.  They may have raised it.  I'm guessing
14  while now it's probably up to 90 or $110,000.00.
15  So if you work out of the US, you're exempt from
16  income tax definitely at that time.  The whole
17  70,000 would have been exempt.
18      Q.      Do you know whether you would have
19  been paid in such a manner that you would have
20  been able to take an advantage of the IRS rules?
21  A.    Well, I was hoping I'd get paid in
22  Dominica, but now that you bring it up, I mean, if
23  they paid you out of Edison then, yes, that would
24  have been a problem but --
25      Q.      And you never inquired about that?

Page 58

1   A.    Well, we never got that far, but that
2   definitely was a draw for me, was -- it appeared
3   if you were -- you were working out of the country
4   that, you know, from a tax point of view, federal
5   income tax point of view, you could use the
6   overseas exemption to federal income tax.
7        Q.    Paragraph 6 of your complaint
8   indicates that during the summer of 2003 you
9   visited the offices of the defendant in Edison and
10  they continued to refuse to communicate with you,
11  and then you used the following language: "The
12  plaintiff because he was a hispanic minority male
13  over the age of 40 was threatened with being
14  lynched by the defendant Gestapo Security if he
15  did not stop bothering the three white females at
16  defendant's offices with the plaintiff's request
17  for information regarding his candedacy for a
18  librarian director position."
19  A.    That's exhibit --
20       Q.    This is the complaint, sir, Exhibit
21  9, Paragraph 6.
22  A.    And the question is?
23       Q.    And the question is when you went
24  to their offices did you identify yourself to the
25  receptionist as a hispanic male.

Page 59

1   A.    No, I did not.
2        Q.    Did you identify yourself as a
3   hispanic male to the Gestapo Security?
4   A.    We never got that far because I left.
5        Q.    So there was no Gestapo Security?
6   A.    There was a threat of being -- having them
7   called which caused the distress.
8        Q.    The threat was to call the local
9   police, correct?
10  A.    I don't know who -- if they had building
11  security or if they were going to call local
12  police, but there was a threat made, which I felt
13  was --
14       Q.    And was the threat they were going
15  to lynch you?
16  A.    The threat was just vague. You know, we
17  don't like you. You're disgusting. Get your
18  nasty self out of here.
19       Q.    They said that?
20  A.    No, but the implication again was -- here I
21  am. Traveled many miles. Simply want to clarify
22  the position or, you know, what is my status with
23  Ross University.
24       Q.    Without any raising of the voice
25  and in good nature?

Page 60

1   A.    I'm as gentle as a lamb.
2        Q.    Paragraph 7 of the complaint on
3   Page 4 reads first cause of action. Paragraphs 1
4   through 6 are incorporated herein by reference.
5   "By its actions of jerking the plaintiff around in
6   the defendant's application and interview process
7   because the plaintiff is a hispanic minority male
8   over the age of 40 years, the defendant Ross
9   University School of Medicine has violated the
10  provisions of Title 7 of the Civil Rights Act," so
11  forth and so on. Other than the fact that you put
12  on your resume that you were a hispanic male, you
13  never indicated to anybody during your discussions
14  with them that you were hispanic, did you?
15  A.    No, I did not.
16       Q.    You say you're over the age of 40
17  years. What is your date of birth?
18  A.    May 11th, 1960.
19       Q.    You didn't put your date of birth
20  on your resume, did you?
21  A.    No.
22       Q.    Next time you will?
23  A.    Should I? I don't know.
24       Q.    Other than the facts as you state
25  them here, do you have any other facts, not

Page 61

1   suppositions, not your beliefs, but facts upon
2   which you believe that you were discriminated
3   against you because you were hispanic?
4   A.    I believe that the cause of action speaks
5   for itself and the acts of the university, what
6   they have done also.
7        Q.    So you have no other facts to
8   support your cause of action other than what is in
9   documentation you submitted to date?
10  A.    Correct.
11       Q.    Do you have any other facts other
12  than what you have submitted or testified here
13  today to support the claim that you were not
14  offered a position because you were over the age
15  of 40?
16  A.    No.
17       Q.    Other than the fact you claim that
18  you gave up an interview in a community technical
19  school, is there any other consideration, and I
20  assume that you know what that word means, that
21  you gave to Ross University in connection with
22  their offer of a job interview?
23  A.    No.
24       Q.    Other than the fact that you may be
25  entitled to a one-week trip to Dominica, what

Page 62

1  other damages do you have, are you claiming?
2  A.  All the damages essentially are the lost
3  opportunity at Renton Technical College as well as
4  the fact that -- other than Ms. Fried kind of
5  torpedoing what Dr. Rios wanted to do, again, the
6  measure of damages again would be the number of
7  months that I would have been or number of years
8  that I would have been employed there.
9       Q.  What did you do to mitigate those
10  damages?
11  A.  I've attempted to find suitable employment.
12      Q.  You had a position, didn't you, you
13  had a position with the Federal Government?
14  A.  Well, actually, it appeared I didn't have a
15  position since they determined that I was not
16  going to be working there.  So that was their
17  determination, not my determination.
18      Q.  But you had a job, correct?
19  A.  I had a job subsequent to that, yes.
20      Q.  Did you do anything in connection
21  with Renton College, Technical School, whatever
22  it's called, to try and get another interview?
23  A.  No.  Once I cancelled or they cancelled the
24  interview --
25      Q.  Renton cancelled the interview with

Page 63

1  you?
2  A.  Well, I withdraw -- what was the exact
3  language?  I -- I withdrew.  They withdrew.  There
4  was a conflict there.
5       Q.  Well, withdrawing and postponing
6  are two different things.  Did you write to Renton
7  or call them and say I'm withdrawing my candedacy?
8  A.  I sent them an e-mail stating that I was
9  going to withdraw because --
10      Q.  Why?
11  A.  -- because there was the conflict I had.
12      Q.  What conflict?
13  A.  Because it was the same week that the
14  trip -- I noticed the travel itinerary is not in
15  all of our exhibits, but at one point I did
16  actually get a travel itinerary.
17      Q.  But they didn't offer you a job,
18  Ross University, did they?
19  A.  No, they didn't, but it seemed maybe it
20  was -- my thinking, there was a little bit of an
21  offer here, but if you go to all of the trouble of
22  flying someone from -- I mean if the trip was going
23  to be from Seattle maybe to Miami and then from
24  Miami down to Dominica, I'm not sure exactly where
25  the drop-off point was, but I mean, we're talking

Page 64

1  4,000 miles, 3,500 miles.  I mean, you don't send
2  people on those kind of trips unless you're
3  serious.  And I guess one of the issues, which I
4  don't know if we can even talk about it, we
5  probably can't talk about it, is this:  You know,
6  was the ultimate candidate, whoever was hired when
7  she was, the only one that was actually
8  interviewed, but because I'm just thinking they're
9  a private school or profit-making school that, you
10  know, they're not just going to ship a boat load
11  of people down and pay full rate to conduct ten
12  interviews.  They know who they want and it's more
13  or less a confirmatory.
14      Q.  Why is it that you withdrew your
15  application at Renton rather than asking them just
16  to postpone it just for a week?
17  A.  I just had a very good conversation with
18  Dr. Rios.  He seemed to be totally on board.
19  He -- all of the, how shall we say, connotations
20  were -- everything was a go.  I mean, I guess if
21  he had the authority to hire me right over the
22  phone he might have just done that, but --
23      Q.  He didn't do that though, did he?
24  A.  No, he certainly didn't.  And he said we
25  had to go through the next step, but he seemed all

Page 65

1  gung ho on it.
2       Q.  So based on a telephone interview
3  with no job offer, you made the decision to
4  withdraw an application of employment with Renton,
5  is that fair?
6  A.  No, I wouldn't quite put it that way.  I --
7       Q.  How would you put it?
8  A.  The way I would put it is that my
9  discussion with Dr. Rios was at such favorable
10  magnitude and caliber that he had given me
11  everything except a job offer.  We had gotten --
12  we seemed to have great repo over the telephone.
13  He seemed to be very favorably impressed with my
14  resume.
15      Q.  Explain to me what is impressive
16  about your resume.
17  A.  We'll, at least I had a Master's degree in
18  library science.  I had some medical library
19  experience.
20      Q.  Seven months?
21  A.  That was good enough for him.  It's good
22  enough for me.
23      Q.  Did he say that was good enough for
24  him?
25  A.  Well --

Page 66

1    Q.    Yes or no, did he say seven months
2  is more than adequate?
3  A.    Yes. He indicated that --
4    Q.    No, sir. Yes or no, did he say
5  that to you?
6  A.    Yes. Yes.
7    Q.    So you talked about the fact that
8  you only had seven months experience working in a
9  medical library --
10  A.    Yes.
11    Q.    -- during the telephone call?
12  A.    Yes.
13    Q.    And he said that's fine?
14  A.    Yes.
15    Q.    But he never offered you a job, did
16  he?
17  A.    No.
18    Q.    You made the assumption that he
19  would probably offer you a job when you traveled
20  to Dominica?
21  A.    Yes.
22    Q.    And based upon that assumption you
23  cancelled or withdrew your application from
24  Renton?
25  A.    Yes.

Page 67

1    Q.    Have you applied for any other
2  library positions at any time since not getting
3  the interview with Ross University?
4  A.    Yes.
5    Q.    Where?
6  A.    All over the world.
7    Q.    Have you had any interviews?
8  A.    A few.
9    Q.    Where?
10  A.    My goodness, what was the last one? Oh, I
11  don't know. I can't recall right offhand. Oh,
12  here comes one. Down in Maryland -- no.
13  Virginia. EPCI, some school, I believe it's in
14  Virginia. They had an advertisement in the
15  Chronicle of Higher Education, and they had me
16  drive down there for their little -- they had a
17  little technical college or something, and we did
18  the interview and then nothing.
19    Q.    No job offer?
20  A.    No job offer.
21    Q.    Any other interviews?
22  A.    There have been others similar to that
23  where I've driven and/or done a telephone
24  interview.
25    Q.    In Paragraph 9 of your complaint

Page 68

1  you state that under the law statutes and uniform
2  commercial code of New Jersey the defendants are
3  charged with fraudulent concealment for failing to
4  properly, adequately and timely disclose their
5  decision to breach the contract. What did they
6  conceal from you, the fact that they did not want
7  to give you an interview?
8  A.    Well, the fact that they cancelled the
9  interview but -- or denominated as a postponement
10  when I think -- when Ms. Fried into the situation
11  I guess that's -- that's the second or third week
12  of February, that she convinced Dr. Rios to just
13  break it off. But, again, I never found out about
14  any of that until August when I showed up at the
15  company and kind of got the cold shoulder from
16  everybody.
17    Q.    You apparently reviewed the higher
18  education job sites on a regular basis?
19  A.    Correct.
20    Q.    Had Ross University withdrawn its
21  advertisement for the medical librarian position?
22  A.    As I recall, they had it up in the
23  Chronicle of Higher Education I'm going to say
24  in -- probably in December and January, and then I
25  saw it again probably in maybe June or July, which

Page 69

1  maybe prompted me to go up there because if they
2  were readvertising and they still hadn't
3  interviewed me, that was a concern for me. So my
4  concern was really just to clarify am I on board
5  for the interview, am I not. You know, let's
6  just -- you know, just tell me what's going on,
7  but --
8    Q.    And then you go on to say in
9  Paragraph 11 that Ms. Fried is charged with
10  tortious interference with a contractual and
11  business relationship for her telling Rios to
12  breach the contract because she did not like the
13  plaintiff because he is a hispanic male. Did Dr.
14  Rios tell you that Ms. Fried told him that she
15  didn't like you because you were hispanic?
16  A.    No.
17    Q.    Did he tell you that Ms. Fried
18  indicated that she didn't like you because you
19  were over 40 years of age?
20  A.    I don't believe I ever talked to Ms. Fried.
21    Q.    I said did Dr. Rios --
22  A.    Dr. Rios? No.
23    Q.    What facts do you have to base this
24  allegation, just the implication that it was her
25  doing or that she caused Dr. Rios to cancel the

Page 70

1 interview or the trip down to Dominica?
2 A. Apparently there is no legitimate basis for
3 her to have done that, so --
4 Q. That's your opinion, correct?
5 A. Well, that is what I'm basing this cause of
6 action on, so yes.
7 Q. How were you greatly humiliated?
8 A. Well, when I came up and asked for a
9 straight answer from whoever might be available to
10 give a straight answer -- obviously I only came
11 out there because they weren't sending me -- you
12 know, responding to my e-mail, and all they had to
13 do is say, Mr. Horton, we've decided to move on or
14 we've -- we've withdrawn the advertisement or
15 expanding or contracting or doing something. Just
16 say, okay, we're no longer interested in your
17 candedacy instead of going through this rigmarole
18 of, oh, we're postponing your candedacy
19 indefinitely. I don't know why they had to play a
20 lot of games.
21 Q. How were you humiliated?
22 A. Having to go through that here. Oh, I'm
23 going to go down to Dominica. I'm going to have
24 this trip. They're interested in me for this
25 medical librarian position. So all of that.

Page 71

1 Q. And did your humiliation manifest
2 itself in any physical ailments?
3 A. Physical ailments? I don't know. Stomach
4 ache maybe.
5 Q. So the answer is no?
6 A. Not at this point. I might have a stomach
7 ache later, though.
8 Q. Just give me a second, sir. We
9 might be finished here.
10 (A short recess is taken.)
11 Q. Just one or two more. In your
12 complaint, Paragraph 11, you talk about the
13 defendant Fried interfering with the contractual
14 and business relationship you had with Dr. Rios.
15 Can you explain to me what contractual
16 relationship you had with Dr. Rios?
17 A. Well, I believe a contract was formed when
18 he offered me the interview down there. So once
19 that contract was formed, she had no business
20 trying to disway or manipulate him into changing
21 his mind about having the interview. I mean, he
22 evidently -- to have the interview it was his
23 decision. He made his decision, and then she
24 comes out of left field and undid his decision or
25 tried to get him to undo his decision.

Page 72

1 Q. Your contracutal relationship, if
2 there was any, was with Ross University, was it
3 not?
4 A. Well, correct. It would have been with
5 Ross University acting through him, but he was. --
6 Q. You knew that Dr. Rios wasn't going
7 to pay for your trip out of his pocket? You knew
8 it was Ross University, correct?
9 A. Again, I don't have any specific
10 information of the finances of the institution,
11 but the -- my going down to Dominica depended on
12 his okay, his -- not --
13 Q. But also as he said to you, you
14 have to get in touch with or the human resources
15 department would get in touch with you to set up
16 the trip?
17 A. That was to simply be an administrative
18 manner. The decision for me to interview in
19 person was his decision. He made his decision and
20 then other parties attempted to manipulate him
21 into changing his position.
22 Q. So any contractual relationship you
23 had was strictly between yourself and Ross
24 University for this trip, correct?
25 A. Well, again, Rios as a party or at least an

Page 73

1 agent of the university would have to bear some
2 relationship or --
3 Q. And he was acting solely in his
4 capacity as the dean medical director of the
5 school, correct?
6 A. Perhaps.
7 Q. You weren't going down to interview
8 for a job with him personally, right?
9 A. No. No, I was not.
10 Q. What business relationship are you
11 referring to in that complaint?
12 A. Well, the business -- the contractual and
13 business relationship obviously is with Ross
14 University with Dr. Rios being the agent for
15 initiating that relationship, so --
16 Q. Okay.
17 MR. SCHMIDT: Nothing further.
18 Thank you.
19
20 (Witness excused.)
21 (Deposition concluded at 12:45
22 p.m.)
23
24
25

19 (Pages 70 to 73)

Page 74

```
 1            C E R T I F I C A T E
 2
 3        I, TERESA CUELLAR, a Certified Shorthand
 4   Reporter and Notary Public of the State of New
 5   Jersey, certify that the foregoing is a true and
 6   accurate transcript of the deposition of said
 7   witness who was first duly sworn by me, on the
 8   date and place hereinbefore set forth.
 9        I FURTHER CERTIFY that I am neither
10   attorney, nor counsel for, nor related to or
11   employed by, any of the parties to the action in
12   which this deposition was taken, and further that
13   I am not a relative or employee of any attorney or
14   counsel employed in this action, nor am I
15   financially interested in this case.
16
17
18        _____
          TERESA CUELLAR, C.S.R.
19        LICENSE NO. XIO1843
20
21
22
23
24
25
```

Page 75

```
 1        LITIGATION SUPPORT INDEX
 2
 3
          DIRECTIONS TO WITNESS NOT TO ANSWER
 4
 5
     PAGE - LINE
 6   NONE
 7
 8
 9
          REQUEST FOR PRODUCTION OF DOCUMENTS
10
11
     PAGE-LINE
12   NONE
13
14
15        MOTIONS TO STRIKE
16
     PAGE - LINE
17   NONE
18
19
20
21
22
23
24
25
```

# EXHIBIT 3

Westlaw.

Search Result Citations List - DOCK-FED-ALL      PTN(JOHN /2 D. /2 HORTON)

| Ra | Case Number | Case Title | Filing Date | Court | Misc. Info |
|---|---|---|---|---|---|
| 2. | 02-3291 | HORTON v. AIR FORCE | 06/11/2002 | FED. CIR. | |
| 3. | 05-1649 | HORTON v. BROWNLEE | 06/13/2005 | 4TH CIR. | (3442) |
| 4. | 1:04CV01992 | HORTON v. BROWNLEE | 04/28/2004 | D.N.J. | CIVIL RIGHTS (442) |
| 5. | 1:05CV00814 | HORTON v. HARVEY | 07/12/2005 | E.D. VA. | CIVIL RIGHTS (442) |
| 6. | 1:04CV00929 | HORTON v. HENDERSON ET AL | 03/01/2004 | D.N.J. | CIVIL RIGHTS (440) |
| 7. | 1:04CV00814 | HORTON v. LYLE ET AL | 02/24/2004 | D.N.J. | CIVIL RIGHTS (440) |
| 8. | 2:04CV02165 | HORTON v. LYTLE | 05/19/2004 | E.D. PA. | CIVIL RIGHTS (440) |
| 9. | 2:04CV02406 | HORTON v. LYTLE ET AL | 05/28/2004 | E.D. PA. | CIVIL RIGHTS (440) |
| 10. | 1:05CV00436 | HORTON v. MARTIN ET AL | 03/02/2005 | D.D.C. | CIVIL RIGHTS (440) |
| 11. | 04-4684 | HORTON v. MARTIN, ET AL | 12/23/2004 | 3RD CIR. | (2440) |
| 12. | 05-1455 | HORTON v. MARTIN, ET AL | 04/28/2005 | 4TH CIR. | (3440) |
| 13. | 5:04CV00976 | HORTON v. MARTIN, ET AL | 12/28/2004 | E.D.N.C. | CIVIL RIGHTS (440) |
| 14. | 1:03CV06194 | HORTON v. MARTIN, ET AL | 12/30/2003 | D.N.J. | CIVIL RIGHTS (440) |
| 15. | 04-1759 | HORTON v. MOBLEY | 03/24/2004 | 3RD CIR. | (3440) |
| 16. | 1:03CV03816 | HORTON v. MOBLEY | 08/12/2003 | D.N.J. | CIVIL RIGHTS (440) |

1.

Search Result Citations List – DOCK-FED-ALL      PTN(JOHN /2 D. /2 HORTON)

| | | | | | |
|---|---|---|---|---|---|
| 18. | 1:03CV00140 | HORTON v. ROCHE | 01/29/2003 | D.D.C. | CIVIL RIGHTS (442) |
| 19. | 3:03CV02443 | HORTON v. ROCHE | 07/24/2003 | D.S.C. | CIVIL RIGHTS (442) |
| 20. | 04-1907 | HORTON v. SHULL, ET AL | 04/07/2004 | 3RD CIR. | (3440) |
| 21. | 05-1566 | HORTON v. SHULL, ET AL | 05/26/2005 | 4TH CIR. | (2440) |
| 22. | 1:03CV03817 | HORTON v. SHULL, ET AL | 08/12/2003 | D.N.J. | CIVIL RIGHTS (440) |
| 23. | 1:03CV04282 | HORTON v. SULLIVAN, ET AL | 09/11/2003 | D.N.J. | CIVIL RIGHTS (440) |
| 24. | 1:03CV03419 | HORTON v. U.S. OPM | 07/18/2003 | D.N.J. | OTHER STATUTES (890) |
| 25. | 2:04MC00025 | HORTON v. UND | 09/20/2004 | D.N.D. | OTHER (000) |
| 26. | 2:04CV00110 | HORTON v. UND | 09/21/2004 | D.N.D. | CIVIL RIGHTS (442) |
| 27. | 1:04CV01334 | HORTON v. UNITED STATES OF AMERICA | 03/22/2004 | D.N.J. | CIVIL RIGHTS (442) |
| 28. | 1:04CV03858 | HORTON v. UNITED STATES OF AMERICA | 08/12/2004 | D.N.J. | CIVIL RIGHTS (442) |
| 29. | 1:04CV05997 | HORTON v. UNITED STATES OF AMERICA | 12/08/2004 | D.N.J. | TORTS (360) |
| 30. | 2:04CV02245 | HORTON v. UNITED STATES OF AMERICA | 05/24/2004 | E.D. PA. | OTHER STATUTES (890) |
| 31. | 1:04CV00813 | HORTON v. UNITED STATES OFFICE OF PERSONNEL MANAGEMENT ET AL | 02/24/2004 | D.N.J. | CIVIL RIGHTS (442) |
| 32. | 04-1923 | HORTON v. US OFC PERSONNEL | 04/07/2004 | 3RD CIR. | (2890) |
| 33. | 04-3608 | HORTON v. USA | 09/09/2004 | 3RD CIR. | (2442) |
| 34. | 05-5080 | HORTON, JOHN D. v. MARTIN, JAMES A., ET AL | 03/18/2005 | D.C CIR. | (2440) |
| 35. | 03-1442 | IN RE JOHN D. HORTON | 04/17/2003 | 4TH CIR. | |
| 36. | 05-1347 | IN RE JOHN D. HORTON | 03/31/2005 | 4TH CIR. | |
| 37. | 05-1596 | IN RE JOHN D. HORTON | 06/01/2005 | 4TH CIR. | |

41. 1:04CV00602   IN RE: JOHN         02/13/2004   D.N.J.       CIVIL
                  D.HORTON                                      RIGHTS

45. 01-4931      US v. JOHN D. HORTON  11/30/2001   4TH CIR.
46. 02-4131      US v. JOHN HORTON     02/14/2002   4TH CIR.
47. 5:01M00617   USA v. HORTON         11/20/2001   E.D.N.C.
48. 5:02CR00004  USA v. HORTON         01/08/2002   E.D.N.C.
49. 3:05M00003   USA v. HORTON         01/10/2005   W.D.N.C.
50. 2:04MJ00101  USA v. HORTON         06/30/2004   E.D. TENN.
51. 2:05CR00002  USA v. HORTON         01/19/2005   E.D. TENN.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.